Affirmed and Memorandum Opinion filed February 12, 2008








Affirmed and Memorandum Opinion filed February 12, 2008.

 

 

In The

 

Fourteenth Court of
Appeals

____________

 

NO. 14-06-01027-CR

____________

 

CAROL ANN HOEY, Appellant

 

V.

 

THE STATE OF TEXAS, Appellee

 



 

On Appeal from the 339th
District Court

Harris County, Texas

Trial Court Cause No. 1011999

 



 

M E M O R A N D U M   O P I N I O N

Appellant, Carol Ann Hoey, appeals from her conviction for
serious bodily injury to a child (her four-year-old daughter) by omission.  A
jury found that appellant committed the offense intentionally or knowingly and
assessed punishment at life in prison.  In two issues, appellant challenges the
legal and factual sufficiency of the evidence to support the conviction.  We
affirm.








Background

On October 25, 2004, appellant=s four-year-old
daughter, Amanda, died after ingesting methadone (an analgesic and anti-addictive)
that had been prescribed for appellant.  Appellant testified at trial that on
the night in question, she and her daughter were at the home of John Wayne
Smith, whom appellant was dating at the time.  Appellant kept methadone, as
well as other drugs and her makeup, in a basket on the bathroom floor at this
location.  According to appellant, she and Amanda were watching TV when Amanda
started scratching her arms and rubbing her nose.  Appellant then became
concerned that Amanda may have Agotten into something.@  She gave Amanda
a Benadryl tablet to stop the itching.  About an hour later, after drinking
chocolate milk, Amanda went into the bathroom and vomited.  The vomit contained
milk and an orange foam.  Appellant testified on direct examination that she
did not ask Amanda whether she had gotten into the drugs at that point because
Amanda knew not to and had never done so before.  However, on
cross-examination, appellant admitted that she knew Amanda had taken methadone
when she vomited the orange foamy substance.

After Amanda vomited, appellant discovered that one 40
milligram tablet of methadone was missing.  Thirty to forty-five minutes after
Amanda vomited, appellant called Don Coulter, her methadone counselor. 
According to appellant, Coulter did not tell her to call the police or to
summon an ambulance; instead, he told her to observe Amanda.  He stated that
Amanda would be okay if she didn=t start acting
intoxicated.  After talking with Coulter, appellant gave Amanda crushed antacid
tablets in chocolate to induce further vomiting.  Upon swallowing the antacids,
Amanda vomited three more times.  The nature of the vomiting was so violent
that it scared appellant.  Later, Amanda took a bath and ate, and appellant
kept her up past her usual bed time.  Amanda appeared tired, but otherwise
seemed okay and had stopped itching.  Eventually, appellant let Amanda fall
asleep (sometime between 12 and 2 a.m.), and a couple of hours later appellant
fell asleep.








Shortly before 8 a.m., appellant woke because Amanda had
urinated in the bed next to appellant.  Dark brown blood emanated from Amanda=s nose; she was
unresponsive and did not appear to be breathing.  Appellant screamed for Smith,
who came to the room, wiped Amanda=s face, and
started CPR on her.  Appellant called 9-1-1, and an ambulance arrived at the
house.  Appellant said that she was told she could not ride in the back of the
ambulance with Amanda, so she rode to the hospital with Smith.  At the
hospital, appellant told a nurse that she thought Amanda=s problems might
stem from an automobile accident that they had been in the day before. 
Appellant got to see Amanda, and Amanda was pronounced dead shortly
thereafter.  An autopsy determined Amanda=s cause of death
to be a lethal dose of methadone.

Appellant acknowledged that she had been made aware of the
dangers associated with methadone.  A handbook she received from the drug
clinic informed her that medical attention was necessary anytime someone
ingested methadone who was not prescribed methadone.  She also signed a AStatement of
Responsibility in Handling Methadone@ in which she
affirmed AI=m aware methadone is considered a lethal
drug to all children . . . .@  Appellant further admitted that she lied
under oath to the police when she gave a statement after Amanda=s death, omitting
any mention that Amanda may have ingested methadone.  She also lied when she
told police that Amanda=s condition was likely caused by the prior
day=s auto accident
and that their dog had gotten into the methadone.  Additionally, appellant
acknowledged that she did not tell any of Amanda=s care givers that
Amanda may have ingested methadone because she (appellant) knew her earlier
decision to not seek immediate medical attention had been the wrong course of
action.  At the time, she did not want to believe what had happened to Amanda,
but she now believes that her own failure to properly act caused Amanda=s death.  A couple
of days after giving her statement, appellant told police that Amanda may have
ingested methadone.  At trial, appellant agreed that she understood the dangers
of methadone but Adecided to take a risk and see if [she]
could just help [Amanda herself].@  She said that
Coulter was not guilty but that she was guilty.








Joseph Donald Coulter testified that he was appellant=s primary chemical
dependency counselor at Toxicology Associates.  He said that on the night in
question, appellant called him and asked if there was anything available for
someone who had taken methadone to counteract its effects.  He described a
hospital substance called ANarcan,@ but told her that
it could not be bought over-the-counter.  Regarding whether appellant specifically
told him about Amanda=s ingestion of methadone and under what
conditions he told appellant to call for an ambulance, Coulter testified
somewhat inconsistently.  When first asked, he said that appellant did not
specifically tell him about Amanda taking methadone.  He advised appellant that
if Amanda had taken methadone, appellant Aneeded to call an
EMT, that if [Amanda] got lethargic, she needed to be concerned and call an EMT.@  Coulter then
described appellant=s concession that Amanda Ahad gotten into
the methadone,@ and the following exchange occurred:

Q.      What was your reaction to that?  Did you
think it was no big deal?

 

A.      Well, no, again, I told her the
ramifications of even a small amount of methadone on a child, she should call a
EMT if that was the case.

 

Q.      You felt based on what you had heard in the
conversation at that point that it was crucial that she call an ambulance?

 

A.      Yes.

 

His reason for doing nothing more to insure medical
attention for Amanda was that during the conversation with appellant, he doubted
whether Amanda had ingested methadone.  He then said that whether her illness
was caused by ingesting methadone or something else, Ait=s not going to
hurt to call an ambulance, you know.  And I left it to her.@  Still later, he
explained that he told appellant to keep Amanda vomiting, Agive her an
antacid if she=s taken something, and to wait for the EMT=s.  And if she
turns blue or passes out, you know, start CPR and call an ambulance.@








During examination by the State, Coulter clarified that the
reason he asked appellant about Amanda=s symptoms was
because appellant seemed unsure of whether Amanda had actually ingested
methadone or might be sick for some other reason.  He asked her about symptoms
of toxicity to figure out whether methadone could have been the cause of the
vomiting.  He told appellant that if she was concerned about Amanda=s possible
ingestion of methadone, appellant should get her to a hospital.

Misty Worrell, one of the paramedics who responded to the
scene on the night in question, testified that had the paramedics been told of
methadone ingestion, they would have administered Narcan to Amanda, in the
hopes of reducing the effects of the methadone.  She said that Narcan was
carried in the ambulance, but she refused to speculate whether treatment with
Narcan at that point would have been successful.  Because the paramedics were
unaware of possible methadone ingestion, they treated Amanda only for cardiac
arrest.

Judy Corbett testified that on October 16, 2000, she left
her five-year-old nephew and four-year-old niece at her home with appellant. 
Appellant phoned Corbett and asked her to come home because the children had
ingested medication.  Corbett went to the house and then took the children to
the hospital, where they had their stomachs pumped.  After considering the
foregoing evidence, the jury convicted appellant of intentionally or knowingly
causing serious bodily injury to a child by omission.  See Tex. Penal
Code ' 22.04.

Analysis








Injury to a child by omission under section 22.04 is
classified as a Aspecific result@ crime. 
Alvarado v. State, 704 S.W.2d 36, 39 (Tex. Crim. App. 1985).  In other
words, what matters is whether the defendant=s conduct
(whatever it was) was done with the required culpable mental state to effect
the injury to the child.  Id.  As long as it was voluntary, the nature
of the conduct itself is inconsequential.  Id.  On appeal, appellant
specifically attacks the legal and factual sufficiency of the evidence to
support the jury=s finding that she committed the offense Aintentionally or
knowingly.@  Appellant insists that at most, the evidence
established reckless activity, a conclusion mandating a lower range of
punishment than intentional or knowing conduct.  See Tex. Penal Code ' 22.04(e).  A
person acts intentionally with respect to a result of his or her conduct when
it is his or her conscious desire to cause the result.  Id. ' 6.03(a).  A
person acts knowingly with respect to a result of his or her conduct when he or
she is aware that his or her conduct is reasonably certain to cause the result. 
Id. ' 6.03(b).

In her brief, appellant makes the same arguments regarding
both the legal sufficiency of the evidence and the factual sufficiency of the
evidence.  Accordingly, we will address her arguments only once but will apply
both applicable standards of review.  In addressing these sufficiency
challenges, we utilize the well-established standards of review.  See King
v. State, 29 S.W.3d 556, 562 (Tex. Crim. App. 2000) (legal sufficiency
standards); Johnson v. State, 23 S.W.3d 1, 11 (Tex. Crim. App. 2000)
(factual sufficiency standards).

Specifically, appellant points to the insufficiency of the
evidence to demonstrate that Ashe intended or knew her failure [to] seek
proper medical attention would cause serious bodily injury to [Amanda].@  We begin our
review with an analysis of the Aknowing@ mental state,
because it presented a lower hurdle for the prosecution.  According to
appellant, there was no evidence of (1) her awareness that her conduct was
reasonably certain to result in serious bodily injury to Amanda, or (2) her
knowledge that Amanda Awas certain to die or be seriously injured@ if not taken to
the hospital.  She interprets the evidence as showing her belief that the
measures directed by Coulter, her drug counselor, Aeliminated the
toxin@ from Amanda=s body because
Amanda had Athrown it all up@ and showed no
signs of intoxication or breathing problems.








The evidence, however, as detailed above, supports the
conclusion that appellant knew that (1) her daughter had ingested methadone,
(2) methadone was considered lethal to children, and (3) medical attention was
necessary anytime someone ingested methadone who was not prescribed methadone. 
Despite her knowledge of Amanda=s methadone ingestion and the attendant
dangers to children, appellant waited approximately ten hours before seeking
medical attention for Amanda.  Even after she called 9-1-1, appellant failed to
tell any care provider that Amanda had ingested methadone, despite Coulter=s having told her
that hospitals could administer Narcan to counteract the effects of methadone. 
In fact, appellant admitted that she lied to care providers about the cause of
Amanda=s dire condition.

Appellant=s testimony that she replied upon Coulter=s advice was at
least partially refuted by Coulter.  Although Coulter testified somewhat
inconsistently on exactly what he told appellant, his ultimate message was:  if
she was concerned about Amanda=s possible methadone ingestion, she should
get Amanda to a hospital.  It is within the sole province of the jury to
reconcile conflicts, contradictions, and inconsistencies in the evidence.  Bowden
v. State, 628 S.W.2d 782, 784 (Tex. Crim. App. 1982); Tran v. State,
221 S.W.3d 79, 88 (Tex. App.CHouston [14th Dist.] 2005, pet. ref=d).

Lastly, there was testimony that appellant had previously
been involved in a situation in which children had ingested medication and had
to have their stomachs pumped at the hospital.  This evidence further supports
the conclusion that appellant was aware of the necessity of medical attention
for children who ingest medication not intended for them.

Accordingly, we find the evidence to be legally and
factually sufficient to support the jury=s finding that
appellant knowingly caused severe bodily injury to Amanda by omission.  We
overrule appellant=s two issues. 

We affirm the trial court=s judgment.

 

 

/s/      Adele Hedges

Chief Justice

 

Judgment rendered
and Memorandum Opinion filed February 12, 2008.

Panel consists of
Chief Justice Hedges and Justices Anderson and Seymore.

Do Not Publish C Tex. R. App. P. 47.2(b).